Good morning, Your Honors. If it may please the Court, Wayne Fricke, appearing on behalf of Kent Deboer in this case versus the City of Olympia. If I could reserve two minutes for rebuttal, I'd appreciate it. The case, Your Honor, essentially involves, or more than essentially involves, a situation where Kent Deboer, who was known to the mental health community as a known schizophrenic, was having, I guess I'd call it an episode, on this particular day in 2002 at his parents' residence. The mother called the mental health professional to have him taken to Western State Hospital, which is in Washington, which is a hospital for the mentally ill. The mental health professional then called the police for assistance, only to get him, or help him get Kent to the mental health institution. They came to the scene, got there. The situation escalated, I would suggest, after the police called both the mother and the father, the Deboers, and had them exit the house, which they were able to do without any problems at all. At that point, they started, I guess in essence, a tactical scheme to get him out of the house as quickly as possible. Things escalated. And they really escalated, quite frankly and ironically, at the time when Kent Deboer was calming down. And what I mean by that, at the very moment, and that's through all the were apparently moments before, at his chest or whatever. At the moment he puts those down, walks away from the kitchen table, is the very moment they try to get into the garage door. And then of course everything falls apart. Kent Deboer runs back to the kitchen table. At the same time he gets to the table, the door is blasted open physically. Taser goes off, knife comes flying, shots are fired, and he's seriously injured. He's since recovered. And that's the essence of the factual background in this case. The situation here is whether the acts leading up to that shooting should have taken place at all. And I would suggest, Your Honors, that based on the Alexander case that came out of California in 1994, that this case is almost identical to that situation where a person, another mentally ill individual, is ultimately, well, that case killed by the police under, again, a really similar factual situation, not involving an alleged crime, but something other than that deal. In this situation, the judge, Judge Bryan ---- that involved entering a house without an arrest warrant? That's correct. Okay. Well, is there any problem like that here? There's no arrest warrant. But there's no difficulty about entering the house because the parents had called for assistance. Not from the police, however. Well, they called for assistance. And they were escorted out of the house. And there's no indication that as the owners of the house, they told the police they could not enter. I mean, it seems to me this is a very different situation. You don't have a question of unlawful entry here. And I don't see any suggestion in your papers that there's a claim of unlawful entry. And I don't think you need, necessarily, an unlawful entry. And I think it's an excessive force claim. And I don't think you have to have to have an unlawful entry. But as I recall, the Alexander case, that was the Fourth Amendment violation, the unlawful entry. Well, I think ultimately, they talked about the whole situation being an unlawful excessive force claim in addition to the unlawful entry at that point. The ---- first of all, I would suggest the parents were not escorted out of the house. They were called, and Mrs. DeBoer specifically was called and said, could you please come out? She came out, walked out. And then later on, I think, I can't recall if they called or physically called out loud to Mr. DeBoer and said, could you come out? And he came out. When they came out, they didn't even seek to get any information from the DeBoers to find out from them what the situation was. The mental health professionals come there. They didn't find out from them to get any information. With the exception of asking Mrs. DeBoer what's his diagnosis, and she said bipolar schizophrenic. Nothing else, not did he have his meds, did he get his meds or what the situation was at that moment, other than she had called to the house for assistance to get him again to the institution. All of those cases since Alexander that distinguish it involve entirely different situations where a person has committed a crime either in the presence of the officer and that's the case of the Billington case, if I'm pronouncing that correctly, from Idaho, or situations where they're coming there to investigate a crime and the officer in those situations is under the threat of attack, him or herself, immediately upon the firing of the shots and does nothing leading up to that to set the situation in motion. Here, of course, again, they didn't have to do what they did. And that's the whole essence of the claim. And when Judge Bryan focused on the moment of the shooting and granting qualified immunity and dismissing all the other claims as a result of that finding, he missed the essence of it. And that's the moments leading up to the shooting. Yes, Tim Perry, our expert, said the moment of the shooting, that was in self-defense, but he didn't say everything going up to that was good police policy or not recklessness or negligence. In fact, it was. What about the fact that he's pouring water out the window? He poured water out, boiling water throughout the door or whatever, in a chair. But it didn't seem, I would say that, I don't think it has much importance because when that happened, leading up to that point, the officer didn't seem to be too threatened because he stayed by the door. And again, after that point in time, and this is all within about 20 or 25 minutes that this takes place, but after that point in time, again, he calms down. He puts the knives down. The knives at that point were never thrown at the officers. I mean, all these other situations, including the U.S. Supreme Court cases, when we talk about excessive force, you're talking about when they uphold summary judgment, you're either an officer himself or herself, or the public is being threatened either by some type of threat. And here, he's in the house. Kent DeBoer is in the house, and the only person, arguably, he's a threat to is himself. But none of the cases speak of using force in the context when you are a threat to yourself. He's locked in the house, in essence. They have it encircled. They control the situation. And all they needed to do is wait to see if the medication was going to take effect or if he was going to calm down by himself. They had time. What medication? I can't remember the name of it, but Mrs. DeBoer, in her deposition, says she had finally convinced him before they got there to take a pill or a couple pills that she, they were given through the mental health agency. That's something the police officers knew? They didn't know because they didn't ask. Well, but this isn't a situation precipitated by the police. They come to a situation where there has been a call for help, and the first thing they see or they think they see is Kent over his father in a threatening fashion. And so I have some difficulty comparing this to situations which you can say in the first instance, if law enforcement hadn't used force, nothing was going to happen. In this case, they faced a threat from the beginning. It seems to me it's a little different to say that, well, maybe they could have inquired and found out about medication, but there's no evidence they knew about medication, so they wouldn't have an expectation that suddenly this person that was threatening Klopper, his father, is going to turn peaceful. Well, I don't think father disagrees with that assertion. I don't think it was over his father. But let me say this. Well, I'll try to describe what they say they saw, and they have an operational perspective. In summary judgment, it shouldn't be granted. Sergeant Hutchins said when he met with the parents, they said, you know, he's bipolar, he's schizophrenic, and he's not taking his medication. I believe what they said, what I got from Mrs. DeBoer's deposition is that he's bipolar, he's schizophrenic, shuffler along back behind him, and that's it, and doesn't seek to find out, doesn't give them the opportunity, and in fact, when the mental health professional gets there and comes to talk to Sergeant Hutchins, he specifically says, get back. And so, you know, knowledge is power. And he chose not to have knowledge. Do you want to save any time? May it please the court. My name is Donald Law, and I represent the defendants in this case. I'm intrigued with counsel's reference to knowledge. Knowledge is power. And my question to that is, what knowledge? Well, the knowledge, for instance, they were not dealing with a criminal. They were dealing with a mentally disturbed person. That was knowledge they had. There was no threat to the police if they didn't rush into the house. If they stayed away and let the situation calm down, they had that knowledge. Is that not correct? They did not have that knowledge. They thought they were dealing with a criminal, not a mentally disturbed person? Your Honor, they knew they were dealing with a mentally disturbed person, and in advance of their arrival, they were told by dispatch that they were dealing with an assaultive mentally ill person who had assaulted his parents. Right. And then the parents were removed from the house, and the police were not in danger of being assaulted if they didn't enter the house. Well, number one, I will say two things, Your Honor, in answer to that. Number one, this house, as has already been pointed out, the very first contact with this gentleman involved the two officers who first arrived going into the house. And they see Kent and hear Kent in a very threatening position relative to his elderly father. That's the first one. Your Honor, I'm talking about after the parents are out of the house. Okay. The police acted properly. They went into the house. They got the parents out. Everything was fine. They were out. That is correct. The parents were out. Now they know they're dealing with a very disturbed person. Yes. And what they would like to have happen is that this person be peacefully restrained and taken where he belongs. Your Honor, from the perspective of Sergeant Hutchins, and he is the one that developed the tactical plan in this situation, he had personally observed behavior that showed in his mind, and I believe in any reasonable person's mind, that this gentleman was extremely dangerous to himself and also to the public were he to get out of that house. Doesn't the department have a plan, a training system for how you deal with mentally disturbed persons? Sergeant Hutchins had been trained as much as any officer that you'd find in Washington State as of the time this incident occurred. Did he comply with the city's plan? Absolutely he did, and there's no evidence whatsoever that he didn't comply. And the city's plan is don't talk to the mental health professionals, burst in with guns when you're dealing with a psychotic person? Your Honor, I will tell you what the circumstance is, and that is that when you have a situation like this, you don't have the ability to speak with the individuals who might possibly have knowledge. And again, I guess I can only speak for the record, where you have Sergeant Hutchins with visual contact with Kent, and he is doing all of these things with knives, they have the obligation to take him into, I guess we'll call it protective custody, because the purpose was to get him to the hospital. He's displaying conduct that is assaultive to his parents, assaultive to the sergeant himself. He attempted to pour boiling water on the sergeant. They know they have to take care of the situation under the fact it's an extremely exigent situation. It needs to be resolved quickly. Now, there's talk about if they had only known. If they had only known, and then the question becomes if they had known why. Well, there's nothing unique about this individual. The police in every city are faced regularly with mentally disturbed people. And it's not that there's a sergeant there who for the first time sees a mentally disturbed person and says we've got to do it this minute. That's not necessarily the best way you deal with a disturbed person is to immediately use force. Well, Your Honor, all I guess I can respond to that is that the test is whether or not a, whether a reasonable police officer in Sergeant Hushing's position could have believed that that conduct was reasonable. And, you know, I want to remind Your Honor that, number one, all of that had gone on. The evidence, and this is part of Judge Bryan's opinion, and that is, number one, the mental health professionals that were there were not going to come to the window, and Carrie Roberts is the one, the only one that knew Kent. Their theory was, well, if they'd only allowed her to come and try to deescalate. Well, in her deposition she very clearly said that their rules were that she was not to become involved at all with a violent person and that it was the police who were to do that. Furthermore, furthermore, with respect to this question of, well, you know, if you don't do that, what do you do? You try to have the mental health professionals come and talk to them? No, they won't do that. Okay. The next theory was... Did he ask, the police asked the mental health professionals, is that what you do? Well... That they were there and they told them... Your Honor, at the time... I'm sorry. Is it correct they were there and they told them to go away? At the time, the officers did not ask them to come. That is correct. However, we now know that if he had asked them, they would not have come. But did they say they would not have told them what the best way is to deal with such a person? Neither of them indicated the slightest knowledge, Your Honor, in terms of their knowledge in terms of dealing with a violent person. These people at the state hospital... Pardon me? ...have no knowledge of how to deal with a violent person? Your Honor, these people are not from the state hospital. Where are they from? The two individuals are from South Sound Mental Health. The gentleman, Mr. Maywald, was the designated county mental health professional. Actually, not the state hospital. The county mental health people don't have any idea how to deal with a violent person? Is that what you're saying? Your Honor, all I can do is tell you what the record is. I'm not disagreeing with you. I'm asking you if that is the fact. You say the record shows that the county mental health experts have no knowledge how to deal with a violent person. What I'm telling you, Your Honor, is that the person that the plaintiffs say should have dealt with Kent as a violent person testified in her deposition that she had virtually no training at all in dealing with violent people. Maybe they sued the wrong people. Pardon me? Maybe they sued the wrong people. Well, I don't know, Your Honor. I don't know. But she had virtually no knowledge at all. And the other gentleman from mental health also had no knowledge? There's no record that he had any knowledge in dealing with mental health people who are violent. But I can tell you that the testimony is that their policy, as stated by Kerry Roberts, was that they were not to deal with violent people. There's a difference between who deals with a person and how you deal with a person. Mental health experts would normally be able to tell the police how you deal with a violent person. But you're saying they're also incapable of that? Your Honor, you're asking me. I'm not sure how I can answer that. I can just speak to the record. And it is completely devoid of any constructive knowledge on their part that's been identified that would have changed the situation. In other words, Your Honor, something like they would have said, well, if you had allowed us to, we would have suggested that you do this or that. That is something that is not in this record. There's nothing that's been suggested by either mental health professional or anyone else that they would have done differently than what the officers did. All they've said is they weren't involved in the process. This was an extremely dangerous, violent person, and it was for the police to get him secured on a gurney, and then they would take over, and their job was simply to make sure that he was transported to St. Peter Hospital, where he would then receive mental health and medical care. Thank you, counsel. I'll be brief because I have to, but there is nothing in the record that suggests these people didn't have the knowledge. And, in fact, Maywald says he would have liked to have had the opportunity to speak. It didn't have to be by the door. That's what they were saying. We weren't going to go by the door. It could have been by phone or it could have been by any other mechanism. And it's not just the mental health professionals over there. It was the DeBoers who have intimate knowledge of how to calm down their kids, and they shooed them away as well. This didn't have to happen. And respectfully, Your Honor, Alexander— The DeBoers are the ones that called for help. Excuse me? The DeBoers are the ones that called for help. For help to get him to a mental health institution, not for a crime. And the essence of this claim, just as it was in Alexander when they reversed the district court, is the claim is that, in that case, Quaid's Fourth Amendment rights were violated because the force the police used was unreasonable under all of the circumstances. And that's exactly what the situation is here. Here is my question. It seemed to me they had a plan to go in, do the taser, put him on a gurney, take him to a hospital, which doesn't seem unreasonable. The question then becomes, when they get in there, the situation shifts to some degree with the knives and he's throwing, and then these gunshots occur. Is it your position that the initial plan to go in was a constitutional violation of anticipated excessive force, or do you focus on some later point? I think you start from the moment the plan develops to the moment they bust down and bust, I use that broadly or loosely, break open the door, to the moment they create the situation that they have to use deadly force and self-defense. Judge Bryan, the district court focused The situation they created was being inside? By using force to get inside throughout that time period. And, of course, the time period is very, very brief. But, nevertheless, that time period leading up, escalating the use of force, which is increasing, including the use of the taser. I would disagree, Your Honor, that the taser under this situation was reasonable because, again, they didn't need to go inside. He was not a threat to the public or to the officers. He had not committed a crime. He wasn't resisting arrest because he wasn't being arrested, and nor was he trying to flee. And those are the circumstances you look at when you talk about qualified immunity and whether the officer's actions were reasonable. Thank you. Thank you, counsel. The case just argued will be submitted. Next case on the calendar for argument is
judges: Reinhardt, McKeown, Clifton